IN THE DISTRICT COURT OF THE UNITED STATES

FOR THE DISTRICT OF SOUTH CAROLINA

COLUMBIA DIVISION

| | |
|---|---|
| CHARLES F. MILLER, | ) Civil Action No. 3:08-1942-MJP-JRM |
| | ) |
| Plaintiff, | ) |
| | ) |
| vs. | ) **REPORT AND RECOMMENDATION** |
| | ) |
| HSBC FINANCE CORPORATION, | ) |
| | ) |
| Defendant. | ) |
| | ) |

Plaintiff, Charles F. Miller ("Miller")[1] filed this action on May 19, 2008. He alleges claims under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§ 2000e et seq. ("Title VII") and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, et seq.[2] Defendant, HSBC Finance Corporation ("HSBC"), filed a motion for summary judgment on January 13, 2009. Miller filed a memorandum in opposition on February 2, 2009, and HSBC filed a reply on February 12, 2009. On March 11, 2009, Miller filed a supplemental opposition memorandum and HSBC filed a supplemental reply.[3]

**SUMMARY JUDGMENT STANDARD**

When no genuine issue of any material fact exists, summary judgment is appropriate. Shealy v. Winston, 929 F.2d 1009, 1011 (4th Cir. 1991). The facts and inferences to be drawn from the

---

[1]Miller also goes by the first name "John." See, e.g., Plaintiff's Dep., Ex. 5.

[2]Pretrial matters in this case were referred to the undersigned pursuant to Rule 73.02(B)(2)(g), DSC. Because this is a dispositive motion, this report and recommendation is entered for review by the court.

[3]On March 10, 2009, the undersigned granted Plaintiff's motion for leave to file a supplemental memorandum based on documents produced in February 2009 by Defendants (with their supplemental response to Plaintiff's first request for production). See Doc. 29.

evidence must be viewed in the light most favorable to the non-moving party. Id. Courts take special care when considering summary judgment in employment discrimination cases because states of mind and motives are often crucial issues. Ballinger v. North Carolina Agric. Extension Serv., 815 F.2d 1001, 1005 (4th Cir.), cert. denied, 484 U.S. 897 (1987). This does not mean that summary judgment is never appropriate in these cases. To the contrary, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986). "Genuineness means that the evidence must create fair doubt; wholly speculative assertions will not suffice." Ross v. Communications Satellite Corp., 759 F.2d 355, 364 (4th Cir. 1985).

In this case, defendant "bears the initial burden of pointing to the absence of a genuine issue of material fact." Temkin v. Frederick County Comm'rs, 945 F.2d 716, 718 (4th Cir. 1991) (citing Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). If defendant carries this burden, "the burden then shifts to the non-moving party to come forward with facts sufficient to create a triable issue of fact." Id. at 718-19 (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986).

Moreover, "once the moving party has met his burden, the nonmoving party must come forward with some evidence beyond the mere allegations contained in the pleadings to show there is a genuine issue for trial." Baber v. Hosp. Corp. of Am., 977 F.2d 872, 874-75 (4th Cir. 1992). The non-moving party may not rely on beliefs, conjecture, speculation, or conclusory allegations to defeat a motion for summary judgment. Id. and Doyle v. Sentry Inc., 877 F. Supp. 1002, 1005 (E.D.Va. 1995). Rather, the non-moving party is required to submit evidence of specific facts by way of affidavits (see Fed. R. Civ. P. 56(e)), depositions, interrogatories, or admissions to demonstrate the existence of a genuine and material factual issue for trial. Baber, citing Celotex Corp., supra.

Moreover, the non-movant's proof must meet "the substantive evidentiary standard of proof that would apply at a trial on the merits." Mitchell v. Data Gen. Corp., 12 F.3d 1310, 1316 (4th Cir. 1993) and DeLeon v. St. Joseph Hospital, Inc., 871 F.2d 1229, 1233 (4th Cir. 1989), n.7. Unsupported hearsay evidence is insufficient to overcome a motion for summary judgment. Martin v. John W. Stone Oil Distrib., Inc., 819 F.2d 547 (5th Cir. 1987) and Evans v. Technologies Applications & Servs. Co., 80 F.3d 954 (4th Cir. 1996).

## FACTS

1. In 1999, Miller began working with a predecessor of HSBC (Banc One) in Columbia, South Carolina. He was approximately sixty years old at the time. Miller Dep. 51.

2. Miller is a Jehovah's Witness. His religious faith and beliefs require him to attend meetings on Monday and Thursday evenings, as well as on Sundays. He has been faithfully doing so for over forty years. Miller Dep. 39-40, 73.

3. Plaintiff moved to the Beneficial Office[4] on Bush River Road in Columbia as an Account Executive ("AE"). He was subsequently promoted to Senior Account Executive.[5] Miller Dep. 51-52.

4. The AE job requires telephone solicitation of potential customers for home mortgages and other loan products. Some late night hours are required to reach people at home in the evenings after their work day. See Christopher DePriest Dep. 24, 31.

---

[4]Banc One was bought by Beneficial Finance, which was later bought by Household Finance, which was subsequently bought by HSBC. Miller Dep. 16. HSBC operates both Beneficial and Household Finance offices. Christopher DePriest Dep. 26-27.

[5]AEs are beginning loan officers. After they have met their goals consistently for three consecutive months and have completed the necessary training, they qualify to become Senior AEs.

5. Beginning in approximately November 2004, Christopher DePriest ("DePriest") became District Sales Manager for North and South Carolina. See DePriest Dep. 13-14.

6. Mark McManus ("McManus") was the Division Human Resources Manager for HSBC from January 2001 until November 2008. Miller worked in McManus's division. McManus Aff., Paras. 3-4.

7. Most of Miller's employment with HSBC was at the company's office on Bush River Road in Columbia, South Carolina. There, his normal work week consisted of working from 9 a.m. to 5 p.m. until HSBC imposed a "late night" hours requirement.[6] Miller told his supervisor at the time that he could not work late nights on Monday and Thursday because of his religious meetings. At that time, he began working 9 a.m. to 7 p.m. on Tuesdays and Wednesday (his "late nights") and 9 a.m. to 3 p.m. on Fridays. Miller Dep 52-56.

8. On his 2006 Performance Management report, Miller received a production summary rating of "5" meaning "significantly below the performance required by the Business," and an overall rating of "4," meaning "not consistently achieving the performance level required by the Business." For the year 2006, Miller made his monthly new money goal in only six of the twelve months, and for the year he did not make his real estate, personal home, or auto loan goals. Miller Dep., Exs. 3 and 5.

9. In 2006, the branches in which Miller worked had the following monthly goals: new money $260,000, 3 real estate units, 2 personal home loan units, 10 non-real estate units, and 1 auto unit. Miller Dep., Ex. 5.

---

[6]DePriest states that the late night requirement was implemented in 2004 or 2005. DePriest Dep. 31.

10. For the first four months in 2007, Miller did not make his new money goal in any month, nor did he make any of his monthly goals for real estate, personal, or auto loans. Miller Dep., Exs. 4, 8, and 9; McManus Aff., Ex. 2.

11. In addition to Performance Management reports, HSBC utilizes a Performance Improvement Plan (also known as a corrective action procedure) for employees who are having performance problems. If an employee fails to meet his goals for two consecutive months, the employee receives a formal verbal warning. If he fails to meet goals for a third consecutive month, the employee receives a written warning. If the employee has not met his goal for the fourth consecutive month, he receives a final written warning. The next step in the process, if the employee still fails to meet his goal the following month, is termination. If an employee meets monthly performance goals for one month at any time during the process, the current corrective action level is extended. If he meets performance for two consecutive months, the corrective action is terminated. With management approval, and depending on individual circumstances, certain steps can be skipped or extended. Managers, supervisors, and HR work together to administer the policy. McManus Aff., Para. 6.

12. Miller received an initial verbal warning concerning his performance from his branch manager, Tobias Wolford, in December 2006. Wolford gave Miller a written warning with a followup date of April 2, 2007. Miller Dep., Ex. 8.

13. In early April 2007, Miller was transferred to HSBC's office on Decker Boulevard in Columbia. The parties dispute the reasons for the transfer. DePriest states that he was concerned about Miller's inability to achieve his performance goals and thought that moving him to another office in Columbia (which was closer to Miller's home in Elgin, South Carolina) might help improve his performance. DePriest Dep. 69. Miller appears to claim

5

that he was transferred to the Decker office to increase sales at that location. See Miller Supp. Opp. Mem. at 5; and Doc. 25, Ex. A (email from Langley).

14. HSBC provides that Miller's Performance Improvement Plan was extended for a month to let him adjust to the new office. Miller did not meet his performance goals in March or April and he received a final written warning on May 4, 2007. The follow-up date was May 31, 2007. Miller Dep., Ex. 9. HSBC provides that if Miller failed to meet his goals for May, he would be subject to termination of employment under the corrective action procedure.

15. Jennifer Langley ("Langley") was the branch manager of the Decker location. See Langley Dep. 10.

16. At the time of Miller's transfer, the Decker Boulevard office closed at 6 p.m. There, Miller's schedule was 9 a.m. to 6 p.m. on Mondays through Thursdays, and 9 a.m. to 3 p.m. on Fridays. Miller Dep. 58-59.

17. Miller overhead Langley talking to DePriest about Miller's objection to working on Monday and Thursday nights because of his religious obligations. Miller Dep. 84-85. Langley said this conversation took place in late April or early May and she became upset because DePriest was talking about all AEs working until 8 p.m. on Monday, which she knew would interfere with Miller's church meetings and would create child care issues for her other AEs. Langley Dep. 26-30.

18. DePriest stated he first learned Miller was not working three late nights a week during a May 16, 2007 conversation with Langley. He claims Langley reported Miller made it known he (Miller) was only going to work two late nights a week and that Langley was contacting DePriest because Miller was "basically being insubordinate." DePriest Dep. 33-34, 38.

6

19. DePriest and McManus had a telephone conversation on approximately May 17, 2007. McManus states the general issue of the schedule was brought up and he told DePriest the unwritten rule was that AEs would work until 8:00 p.m. on Monday nights and then two other nights a week until 7:00 p.m. DePriest asked McManus if this policy could be enforced as to Miller and that McManus replied "yeah, you can" because it was division policy and Miller was not performing. McManus Dep. 25-29.

20. On May 14, 2007, two emails were sent from Langley to McManus, with a copy to DePriest. The first, sent at 12:08 p.m., indicates Langley's office was advised that the Decker location had to work until 8 p.m. on 3 nights a week to get back on plan because the office was only at 72% of goal year-to-date. The email details problems that three of Langley's employees had working past 6 p.m. because of childcare issues, and she wrote that Miller had "religious obligations on Monday and Thus so he can work 2 nights to 8 pm but this does not meet expectations." In the second email at 2:08 p.m. that afternoon, Langley wrote "[m]y AE[]s have told me 7 o[']clock would be tough but workable, but children would be in office for min of 1 hr. (no other options available for these mothers)[.]" Doc. 25, Ex. A (emails from Langley).

21. DePriest traveled to the Decker office on May 17. He met with Langley and Miller and discussed Miller's performance.[7] Miller had approximately $160,000 towards his monthly new money goal of $260,000 and said he had other deals he was working. DePriest and Langley had reservations as to whether Miller could make the May goal, but Miller believed it was possible to make his goal. Miller Dep. 75, 80, 97-98, 129.

---

[7]The parties dispute the purpose for this meeting. Miller claims it was to insist he work the established late night schedule and HSBC contends it was to discuss Miller's performance.

7

22. DePriest asked Miller about his schedule and whether he was working 3 late nights. DePriest Dep. 46, 76. Miller said he could only work two nights because of his religious obligations on Monday and Thursday evenings. The parties dispute the rest of the meeting. Miller claims the conversation kept going in a circle and DePriest never gave him any specifics. Miller Dep. 73. DePriest and Langley recall that DePriest asked Miller why, if there were five days available during the week, he could not work three late nights, even excluding the two on which he had religious observations. They claim Miller stated he was only going to work two nights. DePriest Dep. 46, Ex. 2; Langley Dep. 35-37. Miller claims that the option to work Friday nights was never offered to him at the meeting,[8] and although Miller admits Friday night was a possibility, it just never came up at the meeting. Miller Dep. 78.

23. Miller states, because the conversation was going nowhere, he asked DePriest, "are you going to terminate me" and DePriest replied "yes." Miller Dep. 73. DePriest claims he told Miller that he did not want his employment to end this way, but if Miller was not willing to work the required third late night that was available to him, HSBC would not be able to continue to employ him. DePriest Dep. 47.

24. During the meeting, DePriest raised the possibility of retirement. Miller asked DePriest about the possibility of a severance package and DePriest told him he would check on it and also get him the telephone number for benefits so Miller could check on any retirement options he might have. Miller Dep. 89, 91.

25. In a telephone conversation later that afternoon, DePriest gave Miller the telephone number for the benefits department. DePriest also asked Miller if he wanted to reconsider working

---

[8]Miller states that he did not think Friday was an option because everyone left the office at 3 p.m. and he did not have a code to get into the building. Miller Dep. 78.

the three late nights available to him and Miller responded that Friday had never been presented as an option. DePriest told Miller that Friday was an option, Miller responded he could work Friday nights, and DePriest told Miller that he would still be subject to termination at the end of the month if Miller did not make his production goal. Miller alleges that DePriest either slammed down or dropped the phone. After the conversation, Miller was set to come back to work the next day, Friday, from 11:00 a.m. to 8 p.m. DePriest Dep. 55, 58; Miller Dep. 74-75, 93-94.

26. Miller decided not to return to work because DePriest did not offer the option of a late Friday until the last minute, Miller did not think he should put himself through the emotion of possible termination again, and there was no guarantee that he would have made his May 2007 goal. Miller 75, 113-116.

27. DePriest, Langley, and McManus believed that Plaintiff had resigned by abandoning his job when he did not return to work. DePriest Dep. 59, 62; Langley Dep. 46; McManus Dep. 32. DePriest and McManus looked at Miller's sales numbers pending on May 18, 2007, thought it did not appear that Miller would be successful in meeting his May goal, and decided to code his termination as one for inability to perform, rather than job abandonment, in order to pay Miller severance.[9] McManus Dep. 37-38. Miller received a severance payment of $4,772.50. Miller Dep. 109, Ex. 7.

28. On June 15, 2007, Miller filed a Charge of Discrimination with the South Carolina Human Affairs Commission ("SCHAC") and with the United States Equal Employment Opportunity

---

[9]If an employee is terminated from HSBC for job abandonment, he is not eligible for severance, but he is eligible for severance if terminated for performance. McManus Dep. 38.

9

Commission ("EEOC"), alleging violations of Title VII and the ADEA. The EEOC issued a Notice of Right to Sue to Miller on March 13, 2008. Complaint, Ex. 1.

29. HSBC sent a letter to SCHAC on July 18, 2007 stating:

> As an accommodation for Mr. Miller, Beneficial agreed for him to work an alternate schedule of 30-35 hours per week. Beneficial does not have part-time sales associates, and Mr. Miller began his alternate schedule on July 14, 2004 with the express understanding that his sales goals would remain the same and had to be met each month. Mr. Miller's sales goals consisted of meeting a minimum of $260,000 which were the same goals for all employees. He only made this goal six times in 2006 and 2007 combined. In reviewing Mr. Miller's timesheets, he was working up to 40 hours a week and was still not able to achieve his goal. He went through HSBC's standard performance management process to address his lack of production which subsequently resulted in his termination. Mr. Miller repeatedly failed to meet these goals which resulted in his termination for unsatisfactory performance on May 19th, 2007 and not because of his age or religious beliefs. Mr. Miller was paid for 7 weeks of severance after his termination.

Miller Opp. Mem., Ex. A.

30. In response to a letter from Miller's attorney, McManus sent a letter to SCHAC dated September 28, 2007. McManus wrote:

> We were willing to accommodate Mr. Miller's request for not working late on Mondays and Thursdays due to his religious obligations. In return, Mr. Miller would work later on Tuesdays, Wednesdays, and Fridays. During a conversation with District Sales Manager Chris DePriest and Branch Sales Manager Jennifer Langley on May 17th, Mr. Miller stated he would only work 2 late nights. Mr. Miller was sent home for his insubordination while DSM DePriest counseled with me on next steps.
>
> Mr. Miller contacted BSM Langley on May 18th and advised he would not be coming back to work. We were perfectly within our policies to either accept this call as his resignation or terminate Mr. Miller for job abandonment. Either would not be eligible for severance. However, since it was apparent that Mr. Miller would probably not achieve his production goals in May, we chose to terminate Mr. Miller for inability to perform and pay severance.

Miller Opp. Mem., Ex. B.

**DISCUSSION**

Miller alleges that HSBC violated his rights under Title VII by failing to reasonably accommodate his religious beliefs and terminating his employment. He also alleges HSBC violated his rights under the ADEA by terminating him based on his age. HSBC contends that its motion for summary judgment should be granted because Miller cannot show that it failed to accommodate his religious beliefs and he cannot show he was subjected to an adverse employment action based on his religion and/or age.

### A. Title VII

Miller alleges that HSBC failed to reasonably accommodate his religious beliefs by insisting that he work on Monday and Thursday evenings. He claims HSBC discriminated against him based on his religion by terminating his employment.

#### (1) Failure to Accommodate

Section 2000e(j) of Title VII provides that "[t]he term 'religion' includes all aspects of religious observance and practice, as well as belief, unless an employer demonstrates that he is unable to reasonably accommodate to an employee's or prospective employee's religious observance or practice without undue hardship on the conduct of the employer's business." 42 U.S.C. § 2000e(j). Thus, an employer has a "statutory obligation to make reasonable accommodation for the religious observances of its employees, short of incurring an undue hardship." Trans World Airlines, Inc. v. Hardison, 432 U.S. 63, 75 (1977).

To establish a prima facie religious accommodation claim, a plaintiff must establish that: "'(1) he or she has a bona fide religious belief that conflicts with an employment requirement; (2) he or she informed the employer of this belief; [and] (3) he or she was disciplined for failure to comply with the conflicting employment requirement.'" Chalmers v. Talon Co. of Richmond, 101 F.3d 1012,

11

1019 (4th Cir.1996) (quoting Philbrook v. Ansonia Bd. of Educ., 757 F.2d 476, 481 (2d Cir.1985)). If the employee establishes a prima facie case, the burden then shifts to the employer to show that it did accommodate the employee's religious belief or it could not reasonably accommodate the religious need without undue hardship. Id.; EEOC v. Firestone Fibers & Textiles Co., 515 F.3d 307, 312 (4th Cir. 2008).

### (a) Prima Facie Case

HSBC appears to concede that Plaintiff meets the first two prongs of his prima facie case. Defendants' Motion for Summary Judgment at 17. The parties dispute whether Miller has established the third prong (that he was disciplined for failure to comply with the conflicting employment requirement).

In the light most favorable to Miller for purposes of summary judgment, he has established that he was terminated at the May 17 meeting for failing to comply with the three late night policy based on his religious beliefs.[10] Miller testified that he thought he was terminated at the May 17 meeting. HSBC contends that DePriest merely gave Miller the rest of the day off so DePriest could inquire into Miller's options if Miller continued to refuse to work three late nights. DePriest, however, thought that at the end of the meeting Plaintiff's employment was over, it was just a matter of whether it was entered as a retirement or termination. See DePriest Dep. 48-49.

### (b) Accommodation

HSBC contends that even if Miller can establish his prima facie case, it accommodated him by offering the option of working three late evenings, including Friday. Miller

---

[10]Miller has not shown that HSBC's three late night requirement was an adverse employment action.

12

disputes that this was ever offered at the May 17 meeting, claims that any other offer was after he was terminated, and claims that any later accommodation was at most was an offer of reinstatement.

Miller argues that the later phone call did not constitute an accommodation because he had already been terminated. He claims that it was unreasonable because no other account executive was required to work on Friday evenings and was probably not a good marketing strategy. Miller argues that HSBC's offer was not an accommodation because it was accompanied by the threat of termination if Miller did return and the offer was made in anger as he claims DePriest slammed down the phone. HSBC argues that any threat of later termination did not make the accommodation unreasonable, as Miller was already subject to termination, it was possible that Miller would make his goal, and the corrective action plan did not require that termination automatically be enforced because certain steps could be skipped or extended depending on individual circumstances.[11]

In the light most favorable to Miller, there is a genuine issue of material fact as to whether HSBC reasonably accommodated him at the May 17 meeting. The parties dispute whether Friday night was offered as an option at the May 17 meeting. Miller testified that it was not. Although not determinative of the issue of whether Friday was offered at the May 17 meeting, the May 14, 2007 emails lend support to Miller's assertions because Langley discussed late night hours in the emails several days prior to the meeting, but there is no mention of Friday nights and Langley indicated that Miller's religious obligations left only two late nights which was unacceptable. As noted above, McManus stated, in a telephone conversation with DePriest prior to the meeting, that DePriest could enforce the three night policy as to Miller. There is also a question of fact as to whether the later

---

[11]Miller asserts that it is disingenuous for HSBC to argue that Miller's concern that he could be terminated again was speculative where it argues on other issues that he was terminated for poor job performance because it was inevitable that he would not meet his goals by the end of May.

13

phone call constituted an accommodation (as it was after Miller thought he was terminated and was accompanied by what Miller perceived as a threat to terminate him two weeks later). See Heller v. EBB Auto Co., 8 F.3d 1433 (9th Cir. 1993)(employer's efforts at accommodation after unlawfully terminating employee was relevant only to the issue of mitigation of damages); see also Toledo v. Nobel-Sysco, Inc., 892 F.2d 1481, 1488 (10th Cir. 1989)(concluding employee did not breach his duty to cooperate with employer in reaching a reasonable accommodation because employer's offer of accommodation came after the initial unlawful refusal to hire), cert. denied, 495 U.S. 948 (1990); Heller v. EBB Auto Co., 8 F.3d 1433 (9th Cir. 1993)(employer's efforts during administrative proceedings at accommodation after unlawfully terminating employee was relevant only to the issue of mitigation of damages).

### (2) Disparate Treatment Based on Religion

Title VII makes it "an unlawful employment practice for an employer--(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin...." 42 U.S.C. § 2000e-2(a)(1). A plaintiff may proceed under ordinary principles of proof using direct or indirect evidence, or, in the absence of direct proof of a defendant's intent to discriminate, a plaintiff can employ the scheme outlined in McDonnell Douglas v. Green, 411 U.S. 792 (1973) to establish a prima facie case of discrimination by offering proof that:

(1)  he is a member of a protected class;

(2)  he was performing his job in a satisfactory manner;

(3)  he was subjected to an adverse employment action; and

>     (4)   the alleged adverse action occurred under circumstances that raise a
>           reasonable inference of unlawful discrimination.

See Booth v. Maryland, __ F.3d __, 2009 WL 2158096 (4th Cir. July 21, 2009); Holland v. Washington Homes, Inc., 487 F.3d 208, 214 (4th Cir. 2007); McDonnell Douglas, 411 U.S. at 802. McDonnell Douglas provides that, once a plaintiff establishes a prima facie case, the burden shifts to the employer to articulate a legitimate, non-discriminatory basis for the challenged employment action. McDonnell Douglas, 411 U.S. at 802. If the employer provides the required evidence of a non-discriminatory reason for the action, the plaintiff must then show that the proffered reasons were not the true reasons for the employment action, but were a pretext for discrimination. Id. at 804; see also Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).

### (a)   **Prima Facie Case**

Neither party has set out the prima facie framework to be used as to Miller's discriminatory discharge or disparate discipline claim. HSBC appears to contend that Miller fails to establish a prima facie case of disparate termination because he cannot show that he was subjected to an adverse employment action. As discussed above, in the light most favorable to Miller for purposes of summary judgment, Miller was terminated at the May 17 meeting (and thus subjected to an adverse employment action).

### (b)   **Legitimate, Nondiscriminatory Reason/Pretext**

HSBC has articulated a legitimate, nondiscriminatory reason for Miller's termination, Miller's poor production. Specifically, HSBC provides that Miller's production was the fourth lowest of sixty other account executives in South Carolina, he was the lowest producer in his branch, and he received a final written warning under the corrective action plan.

Miller argues that he has shown pretext based on HSBC's responses to SCHAC during their investigation. In the light most favorable to Miller for purposes of summary judgment, there is a genuine issue of material fact as to whether the reason given by HSBC is pretext for discrimination. Review of HSBC's responses to SCHAC reveals that HSBC first stated that Miller was terminated for failing to meet his production goals. In his second letter to SCHAC, however, McManus appears to assert that Miller was sent home for insubordination and terminated for either insubordination or job abandonment, but that the termination was later coded as termination for performance in order to pay Miller severance. If Miller was terminated for insubordination, a reasonable jury could find that such a termination was based on Miller's religion (his refusal to work Monday or Thursday late nights based on his religion).

### B. ADEA

Miller alleges that he was terminated based on his age in violation of the ADEA. HSBC contends that Miller fails to establish his prima facie case; it has articulated a legitimate, nondiscriminatory reason for its actions; and Miller fails to show pretext.

"[A] plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." Gross v. FBL Financial Services, Inc., __ U.S. __, 129 S.Ct. 2343, 2352 (2009). Under the alternative burden-shifting method of proof of McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973), a plaintiff may establish a prima facie case of age discrimination under the ADEA by showing that: (1) he is a member of the protected class; (2) his employer took an adverse employment action against him; (3) he was performing his job to the legitimate expectations of his employer; and (4) he was either replaced by someone outside the protected class or similarly-situated employees outside of his protected class were treated more favorably. See Hill v.

Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004). If the Plaintiff can establish a prima facie case, the burden then shifts to the defendant to produce a legitimate, nondiscriminatory reason for its actions against the Plaintiff. Texas Dep't. of Community Affairs v. Burdine, 450 U.S. 248, 253-54 (1981)(this is a burden of production, not persuasion). If the defendant meets this burden, the plaintiff must show by a preponderance of the evidence that the proffered reason was pretextual. See Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 147 (2000).[12]

### (1) Prima Facie Case

Miller has shown that he is a member of the protected class. The parties dispute whether Plaintiff meets the last three prongs of his prima facie case.

### (a) Adverse Employment Action

HSBC argues that Miller was not subjected to an adverse employment action because he was only terminated after he refused of his own accord to return to work. As discussed above as to Plaintiff's religious discrimination claim, in the light most favorable to Miller he has shown he was terminated.

---

[12]Although Miller claims that DePriest brought up retirement at the May 17 meeting, he concedes that he does not assert an age discrimination claim on the basis of direct evidence. Plaintiff's Opp. Mem. at 25. He appears to assert a mixed-motive claim. The Supreme Court, however, recently noted that the text of the ADEA does not authorize a mixed-motive age discrimination claim. Gross v. FBL Financial Services, Inc. __ U.S. at __, 129 S.Ct. at 2350.
The Supreme Court also noted that it has not definitively decided" whether the McDonnell Douglas framework, first developed in the context of Title VII cases, "is appropriate in the ADEA context." Id. at__, 129 S.Ct. at 2349 n.2. In the absence of further direction from the Supreme Court, the undersigned must follow Fourth Circuit precedent, which applies the McDonnell Douglas framework to ADEA claims. See Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)

### (b) Replacement or Similarly-Situated Employees Treated More Favorably?

HSBC contends that Plaintiff fails to meet the fourth prong of his prima facie case because he has not shown that he was replaced by a younger person. Miller argues that he has met the fourth prong of his prima facie case because he has presented other evidence raising an inference of discrimination.

Miller fails to show that he was replaced by someone outside the protected class (or significantly younger). He also fails to show that similarly-situated employees outside the protected class were treated more favorably. Miller claims that DePriest was nicer to younger employees because he held sales meetings at a bowling alley and DePriest appeared to always be "having a great time with [the younger employees] bowling after the meetings." Miller Dep. 122. He also asserts that he did not get a plaque or special recognition after a month in which he had $600,000 in sales. He fails, however, to show that DePriest having a good time with employees bowling was based on age or how other employees who had exceptionally good sales months were treated. Miller also claims that the other AEs at the Decker Boulevard were treated better because they were not required to work three late nights a week. Langley, however, testified that all employees in the branch were being asked to do so and that, shortly after Miller's employment ended, a new requirement was instituted requiring all AEs to work 6 hours after 5:00 p.m. every week. Langley Dep. 23-24. Miller, who was not meeting his sales goals and was on a corrective action plan, additionally fails to show that he was similarly situated to the other AEs in the office (as they were meeting their sales goals and not on corrective action plans).[13]

---

[13]As Miller fails to show that he met the fourth prong of his prima facie case, it is not necessary to determine whether he was meeting HSBC's legitimate expectations.

**(2) Legitimate, Nondiscriminatory Reason/Pretext**

As discussed above, HSBC has articulated a legitimate, nondiscriminatory reason for Miller's termination - his performance. Even if Miller were able to show that this articulated reason was false, he fails to show that the real reason was his age. Here, Miller fails to show that he was terminated "but for" his age.

## CONCLUSION

Based on the foregoing, it is recommended that Defendants' motion for summary judgment (Doc. 20) be **granted, in part**, as to Plaintiff's ADEA claims and **denied, in part**, as to Plaintiff's Title VII claims.

Joseph R. McCrorey
United States Magistrate Judge

August 28, 2009
Columbia, South Carolina